NEW YORK CITY OMNIBUS CORPORATION et al., Plaintiffs, *v.* MICHAEL J. QUILL, as President of Transport Workers Union of America, C.I.O., an Unincorporated Association, et al., Defendants.

Supreme Court, Special Term, New York County, September 11, 1947.

*Samuel Seabury, Boykin C. Wright* and *Thomas F. Fennell, II,* for plaintiffs.

*Harry Sacher* for defendants.

PECORA, J. This is an action for a declaratory judgment. The plaintiff corporations own and operate a number of bus lines

in the city of New York, which carry approximately 1,200,000 passengers daily. They will be referred to hereinafter as the Companies. The defendants are the officers of two labor unions — both unincorporated associations — many of whose members are employed as drivers and clerical personnel by the Companies. They will be referred to hereinafter as the Unions. The Unions are the collective bargaining agents of the drivers and clerical employees in their relations with the Companies.

A contract fixing the terms of employment between the Companies and the Unions expired on September 30, 1946. Negotiations for a renewal of the contract were commenced. The inability of the parties to reach an agreement led to their appointment of one David L. Cole to arbitrate the demands of the Unions and the counterproposals of the Companies. The proceedings before the arbitrator were commenced on March 7, 1947. Over 2,000 pages of testimony and more than 100 exhibits were submitted to him. He made his award on June 18, 1947. The life of the contract of employment thereby formulated, by its own terms, is from July 1, 1947, to January 31, 1948.

Because of a difference of opinion between the parties respecting the meaning of only those provisions of the award which relate to a pension plan, the Companies instituted this action for a declaration of the rights of the parties under those provisions.

The evidence presented to this court consisted of the voluminous record of the proceedings before the arbitrator. Upon the trial the Unions proffered the testimony of the arbitrator, with the view of eliciting from him the meaning of the disputed provisions of his award. Such testimony is clearly inadmissible. It has uniformly been the rule that an arbitrator may not testify to the meaning and construction of his written award (*Flannery* v. *Sahagian*, 134 N. Y. 85; *Citizens Bldg.* v. *Western Union Tel. Co.*, 120 F. 2d 982; *Doke* v. *James*, 4 N. Y. 568, 575; *Campbell* v. *Western*, 3 Paige Ch. 124). Consequently this court declined to receive Cole's testimony.

It now devolves upon this court to construe the award in question. With the wisdom or correctness of the award, the court has not the slightest duty or concern. The matters in controversy between the parties before the arbitrator were decided when the arbitrator made his award (*Fudickar* v. *Guardian Mutual Life Ins. Co.*, 62 N. Y. 392, 399). This court's sole function is to determine and declare the meaning and intent of that portion of the arbitrator's award which is in dispute.

The Unions contend that the award made by the arbitrator grants a pension for life to the employees of the Companies who become eligible therefor during the period of the present contract of employment — that is, between July 1, 1947, and January 31, 1948.

The Companies, on the other hand, maintain that the award merely grants to such eligible employees the right to receive, after retirement, periodical payments only up to the termination of the present contract on January 31, 1948, and no more.

This court is unable to adopt the view of the Companies. It is my firm opinion that the construction placed upon the award by the Unions is the only one which may be reasonably and logically made.

I construe the award in the light of the principles of interpretation long ago enunciated in Lord Coke's Reports (Part VIII, p. 310), in the following trenchant language: '' The good expositor makes every sentence have its operation to suppress all the mischiefs; he gives effect to every word * * *; he does not construe it so that anything should be vain and superfluous nor yet makes exposition against express words, but so expounds it that one part may stand agreeable with the other and all may stand together.'' These rules of construction have been followed by our courts (*Poel* v. *Brunswick-Balke-Collender Co.,* 216 N. Y. 310, 322; *Fleischman* v. *Furgueson,* 223 N. Y. 235, 239; *Wolkind* v. *Berman,* 232 App. Div. 47, 50; *People ex rel. Powott Corp.* v. *Woodworth,* 260 App. Div. 168, 172).

The basic provision of the arbitral award in this case is to be found in the direction that '' the Company shall provide a pension plan similar to the Third Avenue Transit Plan, dated August 27, 1946 '', and that '' the provisions of the Third Avenue Pension Plan '', with some modifications not now material, '' are expressly incorporated herein by reference as though fully set forth herein.'' Among the provisions of the Third Avenue Transit Plan thus adopted and made part of the award by the arbitrator, is the following: '' The Company proposes to provide payment of pensions to its employees during their lives in accordance with the Plan as hereinafter set forth.''

To my mind, the meaning of that provision of the award is clear and unequivocal. I see in it, as a cardinal purpose of the arbitrator, a readily manifested intent to provide pension payments for life for all employees who may become entitled thereto during the employment contract period — that is, between July 1, 1947, and January 31, 1948.

There is nothing in any other portion of the award which compels or justifies a different conclusion. The preliminary discussion of the arbitrator contains — it is true — the following language: " The pension issue at arbitration pertains to a contract which the arbitrator has determined shall continue until January 31, 1948. The award cannot by itself apply for a longer period * * *. This award imposes no obligation on the Company to be assumed after the contract expires * * *. In any event, it is not for the arbitrator at this time to settle the rights and obligations that shall be set up as of the expiration of the contract."

That language, however, must be read together with the decretal portions of the award quoted above, and must be harmonized therewith, if possible. That course presents no real difficulty. It is plain that all that the arbitrator meant was that pension rights should accrue to the employees only so long as the contract term continued, but that, once accrued, those pension rights should continue during the respective lives of the pensioners. That construction recognizes that no pension rights can vest after the contract period has expired — that is, that " the award [of pension rights] cannot by itself apply for a longer period," and hence cannot impose new obligations to pay additional pensions initially arising thereafter. The present award does not require the Companies to " assume " obligations for pensions to which the rights may accrue after the present contract has expired, and which may be fixed by any subsequent contract between the Companies and the Unions. Only those pension rights vesting under the present contract are, by the award, to exist for the respective lives of the pensioners. The granting of pension rights to other employees after the expiration of the present contract must depend upon the terms of each successive contract.

There is nothing in the language of the award which can reasonably be held to cut down the fundamental purpose of the award to grant pensions for life to those becoming entitled thereto under the terms of the current contract established by the award. This is evidenced by much else that is embodied in the award. Thus the award refers with obvious approval to the prevailing practice in New York City respecting transportation companies' pension plans. That practice is what the arbitrator patently intended to adopt and follow. All such plans, according to the evidence, provide for lifelong payments to the pensioners, as does the Third Avenue Transit Plan which the arbitrator expressly incorporated in his award.

Furthermore, it is part of the pension plan prescribed by the arbitrator that no pensioner — once he has been retired — may re-enter the service of the company. That provision is consistent only with retirement upon a pension for life. It would clearly inflict cruel hardship upon a pensioner if he were entitled, upon retirement, only to a maximum of seven monthly pension payments (as the Companies seek to interpret the award) and then left with neither pension nor job. Nothing, it seems to me, could have been further from the arbitrator's purpose than the imposition of such an inequity. Pension provisions have never, to my knowledge, been construed by the courts in any such manner (*Roddy* v. *Valentine*, 268 N. Y. 228, 232). Nor were the learned counsel for the Companies, upon the trial before me, able to call to my attention the existence of any pension plan providing for payments other than for the life of the pensioner.

My study of the record of the proceedings before the arbitrator also persuades me that the Companies' present contentions are not in accord with the views they advanced before the arbitrator. They there repeatedly emphasized that the pension plan, if adopted by the arbitrator, would involve a commitment "for the lives of the employees" pensioned. That, in my mind, is the normal and ordinary meaning of a pension plan for employees, unless some other intent is unmistakably specified. In the case at bar, I can find no purpose or objective in the arbitrator other than to set up a pension plan entitling those eligible to receive its benefits to payments for life.

The conclusion at which I have arrived is also in accord with the prevalent public conception of what is contemplated by a pension system. The wear and tear upon human energies which are caused by the intensive pace of modern mass production have, it seems to me, enlightened public opinion to an appreciation of the social and economic advantages created by the pension principle. It is now widely recognized that those who toil during their competent years, with brain or brawn, to serve society's wants, should not be cast destitute upon the scrap heap when the toll taken by age and the insistent demands of the present-day methods of production have rendered them physically helpless. Our own Court of Appeals, in *Roddy* v. *Valentine* (*supra*, p. 232) observed that "All the reasons of policy which underlie and justify pension legislation in general — the efficiency and morale of departmental service, social protection and social justice — support the conclusion of the last cited and many other similar cases and afford adequate ground for the

decisions." (The cases referred to by that learned court dealt with questions of pension rights established by legislation.)

During the trial, it developed that public statements had been made in behalf of the Unions that a strike of the bus drivers would be called if the Companies did not accept the Union's interpretation of the award. The court thereupon called the attention of the parties to the fact that such a strike, during its continuance, would virtually paralyze the conduct of trade and business in the city, and would inevitably imperil the safety of the millions among the public who make daily use of transportation facilities. To prevent any such calamitous results to the public — a great entity which is not a party to this litigation and which had not the slightest responsibility for the existence of the issues which feature this case — I undertook to make possible an immediate trial and speedy determination of those issues, and urged the parties to refrain from any acts pending the outcome of the litigation which would hurt the public interest. I trust that I have made the speediest possible determination of the issues before me — necessitating, as it did, my familiarizing myself with the very extensive record of the proceedings before the arbitrator. Conceivably, the parties adversely affected by my decision will wish to test its soundness in our reviewing courts. It is their legal right to do so if they wish to exercise it. Because of the public exigencies arising from this suit, I respectfully recommend to our courts of review, in the event that the questions here involved come before them, that they expedite to whatever extent legally possible their consideration of such questions, to the end that they be decided with finality before the expiration of the present employment contract on January 31, 1948. Such a course would also enable those employees of the Companies eligible for retirement before that date to make the necessary decisions for retirement without prejudice to their ultimate rights.

I cannot refrain from stating that the strike threats of the Unions utterly failed of their purpose if they were designed to influence the judgment of this court favorably to their cause. And it should not be necessary to remind litigants that tactics calculated to coerce the courts might constitute a species of punishable contumacy. Neither may litigants pronounce and enforce unilateral judgments in their own cases.

It is deeply to be deplored when parties to a litigation which gravely affects the public interest so far lose sight of that public interest as to place it in jeopardy. Especially is this true in a case like the one at bar, where such conduct could disrupt

the public's business and endanger life and limb. In this court's view, in the instant case the public's rights greatly transcend in importance and value those of the immediate parties to the action. Hence the parties should avoid as sedulously as possible the sacrificing of the public's rights to their own private ends. Indeed, had it been necessary, this court would have wielded any weapon with which it is armed by law to avert disaster to the public interest.

Settle judgment in accordance herewith.